# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lancaster County Children and Youth Social Services Agency, | : | **SEALED CASE** |
| Petitioner | : | |
| | : | |
| v. | : | No. 1255 C.D. 2019 |
| | : | Submitted: May 12, 2020 |
| Department of Human Services, | : | |
| Respondent | : | |

**BEFORE:** HONORABLE P. KEVIN BROBSON, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE ELLEN CEISLER, Judge

**OPINION BY JUDGE BROBSON**       **FILED:  July 1, 2020**

Lancaster County Children and Youth Social Services Agency (CYS) petitions for review of an order of the Department of Human Services (DHS), Bureau of Hearings and Appeals (BHA), dated August 19, 2019, which sustained E.M.'s (Mother) appeal and granted her request to expunge an indicated report of child abuse from the ChildLine & Abuse Registry (ChildLine Registry).[1]  For the reasons set forth below, we reverse.

## I.  BACKGROUND

CYS received a police report regarding an incident that occurred on June 17, 2018, involving the Mother.  According to the police report, the Mother overdosed on heroin while in her vehicle, alone with the exception of her

---

[1] ChildLine is an organizational unit of DHS that operates a statewide toll-free system for receiving and maintaining reports of suspected child abuse, along with making referrals for investigation.  55 Pa. Code § 3490.4; 23 Pa. C.S. § 6332.  The ChildLine Registry is maintained in accordance with the Child Protective Services Law (CPSL), 23 Pa. C.S. §§ 6301-6386.

eleven-month-old son (Child), who was strapped in a car seat. (Certified Record (C.R.) at 25-30, 44.) As a result, CYS caseworker Andrea Tamayo (Caseworker Tamayo) filed an indicated report of child abuse with DHS on August 16, 2018.[2] (C.R. at 7-25.) The following day, DHS notified the Mother that she was listed in the statewide database as a perpetrator in an indicated report of child abuse. (C.R. at 12.) The Mother appealed the decision and requested an administrative hearing. (C.R. at 13.) Administrative Law Judge (ALJ) Andrew P. Maloney conducted an administrative hearing on May 29, 2019, to determine whether DHS was properly maintaining an indicated report of child abuse. (C.R. at 44.) The hearing concerned the allegation that the Mother committed child abuse by creating a reasonable likelihood of bodily injury to the Child when the Mother overdosed on heroin during the June 17, 2018 incident. (C.R. at 44.) In considering that issue, the ALJ focused on whether the Child was in the vehicle while the Mother overdosed, and, if so, whether there was a reasonable likelihood of bodily injury to the Child. (C.R. at 41-51.)

## A. CYS' Case

CYS, through counsel, called Officer Joel Ayers of the Manheim Township Police Department, who testified that while on patrol on June 17, 2018, at 3:57 p.m.,

---

[2] An "indicated report" is defined, in part, as:

> [A] report of child abuse made pursuant to this chapter if an investigation by [DHS] or [CYS] determines that substantial evidence of the alleged abuse by a perpetrator exists based on any of the following:
>
> (i) Available medical evidence.
>
> (ii) The child protective service investigation.
>
> (iii) An admission of the acts of abuse by the perpetrator.

Section 6303(a) of the CPSL, 23 Pa. C.S. § 6303(a).

2

he was dispatched to a local park because a person had suffered a drug overdose. (C.R. at 64-67.) When he arrived at the park, he observed the Mother laying next to the vehicle on the ground with the driver's side door open. (C.R. at 67.) Two people were standing next to her, whom he later identified as the Child's father (Father) and an acquaintance or friend of the Mother (Friend). (*Id.*) When Officer Ayers reached the Mother, she was unconscious and not breathing, so he administered Narcan. (*Id.*) A few moments later, the Mother began gasping for air and regained consciousness. (C.R. at 68.) Emergency Medical Services (EMS) then arrived on the scene to provide medical treatment to the Mother. (C.R. at 68-69.)

Officer Ayers testified that, soon after EMS arrived at the scene, his police partner arrived and found the Child buckled in a car seat in the backseat passenger side of the Mother's vehicle. (C.R. at 70, 74.) All the windows in the vehicle were "up" and the only door that was open was the driver's door. (*Id.*) Officer Ayers testified that the Child did not appear to be in any kind of distress and was not crying when the Father took him out of the car for EMS personnel to examine the Child at the scene. (C.R. at 72, 73.)

Officer Ayers testified that, after EMS transported the Mother away from the scene by ambulance, he spoke with the Father and the Friend. (C.R. at 73.) The Father and the Friend told him that the Child "was with [the Mother], and they were to be meeting [the Father] and the Friend at the park so that [the Father] could . . . see [the Child.]" (C.R. at 74.) The Father also told Officer Ayers that when the Friend and he arrived at the Mother's vehicle, they found the Mother passed out in the driver's seat. (*Id.*) They then opened the driver's side door and brought the Mother down to the pavement. (C.R. at 80.) Officer Ayers testified that, during the course of his investigation, he learned that the Mother and the Father were married

3

but were not living in the same house and that the meeting at the park that day was like a "custody exchange" so that the Father could see the Child. (C.R. at 74.)

In response to questions from the ALJ, Officer Ayers testified he was uncertain how long the Mother was in that condition before he arrived, the car was not parked under a tree, there was no shade where the car was parked, the color of the Mother's vehicle was black, and he did not believe that the Mother's car windows were tinted. (C.R. at 81-84.) Officer Ayers confirmed for the ALJ that, as stated in the third paragraph of the Affidavit of Probable Cause, he knew the temperature outside was 90 degrees because he checked the thermometer in his police vehicle. (C.R. at 69.) The ALJ later admitted into evidence, without the Mother objecting, the Criminal Complaint and Affidavit of Probable Cause that Officer Ayers completed, describing the June 17, 2018 incident.[3] (C.R. at 68, 69, 106, 107.)

---

[3] Officer Ayers' signed Affidavit of Probable Cause, which was part of the Criminal Complaint filed against the Mother on June 17, 2018, contained the following averments:

> 1.) On or about 1557 hours officers were dispatched to . . . [the park] for a report of a female [who] had overdosed. Upon arrival I found the [Mother], on the ground outside of her vehicle . . . not breathing and [with] a faint pulse. The [Mother] began to wake up after NARCAN was administered.
>
> 2.) The [Mother] later admitted that she used heroin in the grass area of the park.
>
> 3.) Inside the vehicle was [the Child] (one year old), the Mother's son, strapped in his car seat. Upon arrival of [the Father], [the Mother's] husband, he found that [the Mother] was seated in the vehicle, not running, and no windows down. The current temperature at the time was ninety degrees.
>
> 4.) [The Mother] and [the Child] were the only ones present when [the Mother] went unconscious.
>
> 5.) Based on the above facts and circumstances, I respectfully request that [the Mother] be made to answer these charges.

(C.R. at 30.)

4

CYS next called Caseworker Tamayo, who testified that she is employed by CYS and works in the Child Protective Services unit. (C.R. at 89, 90.) Caseworker Tamayo, as part of the CYS investigation of the June 17, 2018 incident, testified that she relied upon Officer Ayers' Criminal Complaint and Affidavit of Probable Cause and interviewed Officer Ayers, the Mother, and the Father. (C.R. at 97, 98.)

Caseworker Tamayo testified that when she interviewed the Father a few days after the incident, the Father told her that when he was answering questions from Officer Ayers, he was "feeling flustered and confused . . . and nervous due to the situation that was going on." (C.R. at 95.) The Father told her that the Mother, the Child, and he all arrived there together. (*Id.*) When the Mother walked away, he did not know she was going to use heroin. (*Id.*) Similarly, Caseworker Tamayo testified that the Mother, when she was interviewed, told her that the Father, the Child, and she went to the park together, and she walked away from the Father and Child to meet the Friend who was her drug dealer. (C.R. at 97, 98.) Caseworker Tamayo testified that despite what the Mother and Father told her during their investigation interviews, she relied on Officer Ayers' report and her interview with him when she concluded that the Child was with the Mother in the car when she overdosed. (C.R. at 92.)

Caseworker Tamayo further testified that she prepared the Investigation Outcome Report about the June 17, 2018 incident when she completed her investigation on August 16, 2018. (C.R. at 17-25, 92.) The ALJ later admitted into evidence, without the Mother objecting, Caseworker Tamayo's Investigation Outcome Report and the Criminal Complaint and Affidavit of Probable Cause that Officer Ayers completed describing the June 17, 2018 incident. (C.R. at 68, 69, 106, 107.)

## B. The Mother's Case

The Mother, *pro se*, called the Father to testify. (C.R. at 109.) The Father testified that, on June 17, 2018, when the Mother, the Child, and he got to the park, they crossed the street and walked up a trail. (C.R. at 116.) The parents played with the Child, "having him walk as best he could at that young age." (*Id*.) At some point, the Mother told him that she had to go back to the car but would be "right back." (*Id*.) The Father stayed on the trail with the Child. (*Id*.) After a while, the Father became concerned when the Mother did not return, and he then walked back to the car. (*Id*.)

The Father testified that, as he approached the car, he felt something was wrong, so he "ran up there, and [he] put [the Child] in the car seat quickly because [he] didn't want him . . . in the parking lot [] [w]ith any, like, potential risks from cars coming or going." (C.R. at 117.) After he put the Child in the car seat, he saw the Friend there. (*Id*.) At that point, the Friend ran over to ask him what was wrong, so he handed her his cell phone and asked her to call 911. (*Id*.) He pulled the Mother out of the car and tried to resuscitate her until the paramedics arrived within 5 to 10 minutes. (*Id*.) "Time was really . . . flying at that point," and he was in a state of shock, so his "perception of time was not very. . . precise." (*Id*.)

The Father testified that the police arrived, and they administered Narcan to the Mother. (C.R. at 119.) After the paramedics started attending to the Mother, the police asked him about the "needle" and began to search for paraphernalia when an officer saw the Child in the back seat of the car. (*Id*.) The Father got the Child out of the car and held the Child while the paramedics checked the Child to make sure he was okay. (*Id*.) The Father testified that when he removed the Child from the

vehicle, he was totally asleep and a "bit sweaty as to be expected," but the Child did not seem to be in distress.  (C.R. at 120, 121.)

As to his statement to the police, the Father testified that he was in a state of "shock" and "does not remember all the details."  Specifically, he testified:

> I was, like, my mind was just racing at that point.  But, like, so many different possibilities were racing through my mind of, like, really horrible scenarios and situations, and like what had just happened.  And, like, where-where in God's name you'd just gotten this drug.  Like how long had-your relapse had been, and things like that.  Like all these different factors that I didn't-I wasn't thinking.  It kind of hit me from left field all at once in that situation.  So I was kind of grappling with the situation psychologically.

(C.R. at 121.)  The Father testified that he has Asperger's Syndrome, which affects social skills and communications, so he tends to take things more literally and is awkward in social situations.  (C.R. at 121, 122.)  The Mother asked the Father if his Asperger's Syndrome affected him when the police questioned him, and he testified "definitely," because "there's a reflex that kind of kicks in under a situation of extreme stress . . . [i]t's kind of a mental reflex that kicks in where . . . things . . . don't sink in . . . it doesn't quite hit me that-the seriousness of whatever it was that just happened . . . in the moment until afterward."  (*Id*.)

When asked by the Mother if he read Officer Ayers' Affidavit of Probable Cause and agreed with that statement that the Mother was alone in the vehicle with the Child, the Father replied that he read it but that the Mother was not alone with the Child.  (C.R. at 122, 123.)  The Father testified that, when the police asked him if the Mother was "alone" in the car, he said "yes," but the police must have meant "alone with the Child" when he meant the Mother was alone without the Child.  (C.R. at 123.)

7

The Father, on cross-examination, testified that he did not remember if the windows in the car were "up" when he returned to the Mother's vehicle and buckled the Child into the backseat. (C.R. at 129.) The Father testified that he did not believe that the Child would be harmed when he placed him in the car seat to revive the Mother. (C.R. at 132.)

After the Father's testimony concluded, the Mother testified that the Child was not alone in the car with her when she overdosed on June 17, 2018, and that the Child was never alone in the car unattended without her husband being present, and, therefore, she does not believe her Child was in any danger. (C.R. at 137, 138.) The Mother testified that she picked the park that day because it was close to where her Friend was going to be. (*Id.*) The day before, the Mother and the Father took both their children to two other parks, which is why her daughter did not want to go with them that day. (*Id.*) The Mother testified that her desire to use was caused by the stress of having lost their house, and they were trying to regain a footing and find a way to come back together as a family. (*Id.*) She did not want her husband to know she was using again, so she had to orchestrate something so he would not be aware. (C.R. at 139.)

The Mother testified that the Father, the Child, and she went to the park together and were there for about 20 minutes before the Friend got there and texted her to meet her at the Friend's car. (*Id.*) The Mother left her husband and the Child in the trail area and walked back to the Friend's car to meet her, where the Friend gave her the drugs. The Mother returned to her own vehicle, and she overdosed. (*Id.*) The Mother testified that the first thing she remembers is seeing, from the back of the ambulance, the Father holding the Child, the Friend standing next to him, and the police officer standing next to them. (C.R. at 139, 140.) The Mother concluded

8

her direct testimony by saying that it is important to her that this incident does not follow her, because she is an involved mother who takes her children to sports and is involved with field trips at school, and she wants to continue to do that. (*Id.*)

The Mother, on cross-examination, testified that the Father's statement to the police was in error because he was confused by the questions and that the police claimed the Father made statements that he did not make. (C.R. at 154.) The Mother testified that, although she observed the police talking to the Friend, the Affidavit of Probable Cause does not mention the Friend. (*Id.*) The Mother testified that the Father's Asperger's Syndrome makes him want to please people, and, because he was concerned about the Mother and the Child, he could have been agreeing to what the Friend was saying without even realizing what she was saying. (C.R. at 154, 155.) The Mother testified that the Friend made up the whole story to keep herself out of trouble. (C.R. at 155.)

### C. The ALJ's Recommendation and Adjudication

The ALJ issued a recommended adjudication on August 12, 2019, sustaining the Mother's appeal and directing DHS to expunge the indicated report from the ChildLine Registry. (C.R. at 42.) The ALJ, in his adjudication, made the following findings of fact:

> 1. [The Child] is a male born in May 2017, 11[]months old during the alleged abuse, and two (2) years old as of the May 29, 2019 hearing.
>
> 2. The Appellant E.M., is the [M]other of the subject [C]hild.
>
> 3. As of June 2018, the [Mother] was separated from her husband, [the Father], but they remained amicable and shared physical custody of the [C]hild.
>
> 4. On June 17, 2018, the [Mother] with the [C]hild and [the Father] went to Conestoga Park to spend time together.

9

5. While at the park, the [Mother] met her drug dealer at her vehicle, injected herself with heroin, and become [sic] unconscious in the vehicle from overdosing on the heroin.

6. The [Mother's] drug dealer took the needle the [Mother] used to inject the heroin from the [Mother's] vehicle.

7. At some point, [the Father] went to the [Mother's] vehicle, discovered that the [Mother] overdosed, called 911 around 3:52 p.m., put the [Mother] on the ground next to the vehicle, and began CPR on her.

8. [Officer Ayers] arrive[d] within five (5) minutes of the 911 call being placed to find the [Mother] on the ground next to her vehicle while [the Father] provided her with CPR.

9. [Officer Ayers] did not find the [C]hild was in distress from heat despite the outside temperature being 90 degrees, the vehicle being located in full sunlight and not running, and its windows and doors being shut, except the driver's door being open.

10. On June 17, 2018, [CYS] received a referral that the [Mother] created a reasonable likelihood of bodily injury to the [C]hild during the June 17, 2018 incident.

11. [Caseworker Tamayo] conducted the child abuse investigation for [CYS] and interviewed the [Mother] and [the Father].

12. On August 16, 2018, [CYS] completed its child abuse investigation and filed an indicated report of child abuse listing the [Mother] as a perpetrator of child abuse to the [C]hild for creating a reasonable likelihood of bodily injury based on [the Father] reporting to [Officer Ayers] that he found the [Mother] in her vehicle unconscious with the [C]hild when he went to meet them at the park on June 17, 2018.

13. On August 17, 2018, [DHS] mailed [to] the [Mother] notification that she was listed on the ChildLine Registry as a perpetrator of child abuse to the [C]hild in an indicated report of abuse.

14. On November 9, 2018, the [Mother] filed an appeal requesting a hearing.

10

15. The testimony of [Officer Ayers] and [Caseworker Tamayo] was credible.

16. The testimony of [the Father] and the [Mother] asserting that [the Father] was always with the subject [C]hild while at the park on June 17, 2018[,] was not credible.

(C.R. at 44, 45 (citations omitted).) Nevertheless, the ALJ determined that CYS provided less than substantial evidence that the Mother was alone with the subject Child when she overdosed on heroin on June 17, 2018, because: (1) CYS' case was based upon uncorroborated hearsay evidence; and (2) the Child did not suffer any ill effects, so, therefore, the Child was not without supervision for a very long period of time. (C.R. at 50.) BHA adopted the ALJ's recommended adjudication in its entirety. (C.R. at 41.) CYS then petitioned this Court for review.

## II. ISSUES

On appeal,[4] CYS argues that DHS erred in concluding that Officer Ayers' testimony regarding the Father's statements on June 17, 2018, constituted uncorroborated hearsay testimony that could not be considered in reaching a determination. CYS also argues that DHS committed an error of law by incorrectly applying the statute's definition of "creating a likelihood of bodily injury to a child through any recent act or failure to act." *See* 23 Pa. C.S. § 6303(b.1)(5). In response, DHS argues that it properly ordered the expungement of the indicated report of abuse because CYS failed to establish the substantial evidence necessary to support the finding of child abuse.

---

[4] "This Court's scope of review in expunction proceedings is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence." *E.D. v. Dep't of Pub. Welfare*, 719 A.2d 384, 387 (Pa. Cmwlth. 1998).

11

## III.  DISCUSSION

"The proper inquiry into whether an indicated report of child abuse should be expunged or maintained is whether the report is accurate."  *L.S. v. Dep't of Pub. Welfare*, 828 A.2d 480, 483 (Pa. Cmwlth. 2003).  "[CYS] has the burden of establishing by substantial evidence that an indicated report of child abuse is accurate.  If CYS fails to sustain that burden, a request for expungement will be granted."  *Bucks Cty. Children & Youth Soc. Servs. Agency v. Dep't of Pub. Welfare,* 808 A.2d 990, 993 (Pa. Cmwlth. 2002).

### A.  Admissibility of Officer Ayers' Testimony

With regard to Officer Ayers' testimony about the Father's statements at the scene, to which the Mother did not object, CYS argues that DHS erred in excluding it from consideration as hearsay because:  (1) corroborating evidence existed in the form of Officer Ayers' first-hand observations of the scene; and (2) the Father's statements constituted an "excited utterance" and, therefore, are subject to a hearsay exception.  CYS seems to argue that, because the ALJ found Officer Ayers' testimony credible, the ALJ should have found his testimony regarding the Father's statements at the scene to be substantial evidence that the Mother was alone with the Child when the Mother overdosed on heroin.

Hearsay is a statement, other than the one made by a declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted in the statement.  Pa. R.E. 801(c).  Generally, hearsay is not admissible under the Pennsylvania Rules of Evidence.  Pa. R.E. 802.  We recognize, however, that "Commonwealth agencies [are] not . . . bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be

received." *A.Y. v. Dep't of Pub. Welfare, Allegheny Cty. Children & Youth Servs.*, 641 A.2d 1148, 1150 (Pa. 1994) (citing 2 Pa. C.S. § 505).

We have consistently applied the following standard, referred to as the *Walker* Rule, to determine whether hearsay evidence is admissible at administrative proceedings:

> (1) Hearsay evidence, [p]roperly objected to, is not competent evidence to support a finding of [an agency][;]
>
> (2) Hearsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of [an agency], [i]f it is corroborated by any competent evidence in the record, but a finding of fact based [s]oley on hearsay will not stand.

*Rox Coal Co. v. Workers' Comp. Appeal Bd. (Snizaski)*, 807 A.2d 906, 915 (Pa. 2002) (citing *Walker v. Unemployment Comp. Bd. of Review,* 367 A.2d 366, 370 (Pa. Cmwlth. 1976)). The *Walker* Rule "need not be considered if evidence is admissible under an exception to the hearsay rule." *Estate of Fells by Boulding v. Unemployment Comp. Bd. of Review*, 635 A.2d 666, 669 (Pa. Cmwlth. 1993), *appeal denied*, 647 A.2d 905 (Pa. 1994).

One of the more well-established exceptions to the inadmissibility of hearsay evidence is commonly referred to as the "excited utterance exception," and it is set forth among other hearsay exceptions in Pennsylvania Rule of Evidence 803. Specifically, Rule 803(2) defines an "excited utterance" as:

> A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition.

Pa. R.E. 803(2).  A statement meets the requirements of this hearsay exception if it is:

> A spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Cmwlth. v. Jones*, 912 A.2d 268, 282 (Pa. 2006).  "[T]here is no clear-cut rule as to the time sequence required for a statement to qualify as an excited utterance, but rather that fact-specific determination is to be made on a case-by-case basis." *Cmwlth. v. Boczkowski*, 846 A.2d 75, 95-96 (Pa. 2004).

"In assessing a statement offered as an excited utterance, the court must consider, among other things, whether the statement was in the narrative form, the elapsed time between the startling event and the declaration, whether the declarant had an opportunity to speak with others and whether, in fact, she did so." *Cmwlth. v. Carmody*, 799 A.2d 143, 147 (Pa. Super. 2002).  "'[T]he crucial question, regardless of the time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance.'" *Id.* (quoting *Cmwlth. v. Gore*, 396 A.2d 1302, 1305 (Pa. Super. 1978)).  "It is 'the spontaneity of . . . an excited utterance [that] is the source of the reliability and the touchstone of admissibility.'"  *Id.* (quoting *Cmwlth. v. Chamberlain*, 731 A.2d 593, 596 (Pa. 1999)).

For example, a hearsay statement made fifteen minutes after an incident in response to a question by a police officer may still be admissible as an excited utterance.  *Cmwlth. v. Penn*, 439 A.2d 1154, 1159 (Pa.), *cert. denied*, 456 U.S. 980

14

(1982). In *Penn*, a child witnessed the stabbing death of his mother and immediately ran to a neighbor's house one block from the scene of the crime. *Penn*, 439 A.2d at 1159. The child and neighbor returned to the crime scene fifteen minutes later and, while watching his mother, still alive, being carried out on a stretcher, the child responded to a question by one of the officers, stating "Walter Penn stabbed his mother." *Id.* The trial court found that the child was visibly upset and shaken since witnessing the stabbing of his mother and noted that the "fact that the boy's statement was not made immediately after the stabbing does not preclude its spontaneity." *Id.* The trial court admitted the child's statement into evidence using the "excited utterance" exception to the hearsay rule. *Id.*

Based upon that legal framework, we must first consider whether Officer Ayers' testimony as to the Father's statements constitute hearsay evidence admitted without objection. If so, we must then consider whether the statements are subject to an exception to hearsay, in this case the excited utterance exception, such that the statements are admissible without consideration of the *Walker* Rule. If not, then we must consider whether corroborating evidence exists within the record, such that the statements are admissible under the *Walker* Rule.

Officer Ayers testified that the Father and the Friend told him that the Child "was with [the Mother], and they were to be meeting [the Father] and [the Friend] at the park so that [the Father] could . . . see [the Child.]" (C.R. at 74.) Officer Ayers testified that the Father told him that when the Friend and he arrived at the Mother's vehicle, they found the Mother passed out in the driver's seat, opened the driver's side door, and brought the Mother down to the pavement. (C.R. at 74, 80.) Officer Ayers' testimony about what the Father told him on the day of the incident is hearsay. Moreover, the Mother did not object to the hearsay testimony during the

15

hearing. Thus, the Father's statements as testified to by Officer Ayers constitute hearsay testimony admitted without objection.

As to whether the Father's statements are subject to an exception to the hearsay rule, specifically the "excited utterance" exception, the record establishes that the Father's discovery of the Mother unconscious in the vehicle from an overdose was a sudden and stressful situation for him. Both the Father and Officer Ayers provided competent evidence that the Father was attempting to resuscitate the unconscious Mother moments before Officer Ayers arrived at the scene. The record also establishes that the discussion between Officer Ayers and the Father occurred when the Mother was with EMS in the ambulance receiving treatment from the overdose and very close in time to the stressful event. The Father testified that, when he spoke with Officer Ayers, he was in a "state of shock," and Officer Ayers testified that the Father was "distressed." (C.R. at 121, 76.) In either case, it is clear that the Father's statements to Officer Ayers were made when the nervous excitement continued to dominate him and the reflective process was still in abeyance. Further, the Father had made the statements before he had the opportunity to discuss the matter in detail with the Friend or the Mother. We, therefore, conclude that the Father's statements to Officer Ayers on the day of the incident constitute an "excited utterance" and are admissible as an exception to the hearsay rule.

Thus, we agree with CYS that DHS erred in excluding Officer Ayers' testimony as to statements made by the Father at the scene of the incident. Based upon the credibility determinations set forth in the adjudication, the Father's statements constitute substantial evidence that the Child was alone in the car with the Mother who had overdosed.[5]

_____

[5] The substantial evidence standard established by Section 6303(a) of the CPSL, 23 Pa. C.S. § 6303(a), differs from the substantial evidence standard typically used in administrative law.

16

We now consider whether DHS committed an error of law by incorrectly applying the statute's definition of child abuse. Section 6303(b.1) of the CPSL, 23 Pa. C.S. § 6303(b.1), provides, in part:

> (b.1) Child abuse.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
>> (1) Causing bodily injury to a child through any recent act or failure to act.
>>
>> . . . .
>>
>> (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

CYS maintains that the Mother's actions on June 17, 2018, constituted "child abuse"[6] because she intentionally, knowingly, or recklessly created a reasonable likelihood of bodily injury[7] to the Child when she overdosed on heroin while alone with the Child in her vehicle. The ALJ stated in his adjudication:

> [CYS] provided less than substantial evidence that [the Mother] was alone with the [Child] when she overdosed on heroin on June 17, 2018. [CYS] relied upon [the Father's] June 17, 2018 statement to [Officer Ayers] to conclude that the [Mother] arrived at the park with the [Child] in her vehicle['s] back seat, overdosed on the heroin with the [C]hild in the vehicle and then the [Mother] and [the Child] were discovered by [the Father],

---

Courts typically define "substantial evidence" as "relevant evidence upon which a reasonable mind could base a conclusion." *Johnson v. Unemployment Comp. Bd. of Review*, 502 A.2d 738, 740 (Pa. Cmwlth. 1986). Substantial evidence, as defined by Section 6303(a) of the CPSL, however, is "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion."

[6] We note that the Child meets the CPSL's age requirement to be classified as a victim of child abuse because he was less than 18 years of age when this incident took place on June 17, 2018. *See* 23 Pa. C.S. § 6303(a). Further, we note that the Mother may be classified as a perpetrator of child abuse to the Child. *See id*.

[7] "Bodily Injury" is defined as "[a]n impairment of physical condition or substantial pain." 23 Pa. C.S. § 6303(a).

17

who called 911 and started CPR on the [Mother.] However, [the Father's] hearsay to [Officer Ayers] could not be used to find the [Mother] was alone with the [Child] in her vehicle before [the Father] arrived as alleged in the report because it was not corroborated by other admissible evidence.

(C.R. at 50.) As a result of our decision that Officer Ayers' testimony that the Father told him that the Mother was alone with the Child in the vehicle constitutes admissible evidence, Officer Ayers' testimony can now be used to meet CYS' burden to prove that the Mother was alone with the Child when she overdosed on heroin.

We also take into consideration Caseworker Tamayo's testimony that despite what the Mother and Father told her during their investigation interviews, she did not find their information satisfactory, and she relied on Officer Ayers' report and her interview with him when she concluded that the Child was with the Mother in the car when she overdosed. In this regard, we are mindful that the ALJ found Officer Ayers' and Caseworker Tamayo's testimony credible, the Mother's and Father's testimony not credible, and that Officer Ayers and Case Worker Tamayo "lacked a demonstrated motivation to fabricate testimony." (C.R. at 46, 50.)

Based upon the ALJ's credibility determinations and the now-admissible statements of the Father, CYS met its burden to prove that the Mother created the reasonable likelihood of bodily injury to the Child when she overdosed on heroin while alone with the Child in the vehicle. The ALJ focused on Officer Ayers' testimony that, when the Child was removed from the vehicle, he was not in distress. The ALJ concluded that, in such a short period, the Child suffered no ill effect from being in the hot vehicle. Thus, it appears that the ALJ considered whether the Mother *caused* bodily injury to the Child—*i.e.*, Section 6303(b.1)(1) of the CPSL— rather than whether the Mother *created a reasonable likelihood of* bodily injury to

18

the Child—*i.e.*, Section 6303(b.1)(5) of the CPSL—through a recent act or failure to act.[8]  Although how the Child appeared after being removed from the vehicle and the duration of time he was in the vehicle are relevant considerations, other considerations are relevant to the analysis as well.  Here, the Mother overdosed while alone with an eleven-month-old child strapped in a car seat in the back seat of the car with the doors shut and the car windows rolled up on a hot day in a public park.  Moreover, based on the aforementioned circumstances, we conclude that the Mother acted "recklessly" through her actions on June 17, 2018.[9]  Based on the record before us, CYS met its burden to prove that the Mother created a reasonable likelihood of bodily injury to the Child when she overdosed on heroin while alone with the Child in her vehicle.  For these reasons, we agree with CYS that DHS erred in concluding that the Mother should not be placed on the ChildLine Registry based on CYS' indicated report of child abuse.

---

[8]  Caseworker Tamayo's Investigation Outcome Report specifically categorized the "abuse/neglect" as "Creating A Reasonable Likelihood Of Bodily Injury To A Child Through Any Recent Act/Failure To Act."  (C.R. at 10.)

[9] Pursuant to Section 6303(a) of the CPSL, 23 Pa. C.S. § 6303(a), the terms "knowingly," "intentionally," and "recklessly" have the same meaning under the CPSL as they do under Section 302 of the Crimes Code, 18 Pa. C.S. § 302.  Section 302(b)(3) of the Crimes Code, 18 Pa. C.S. § 302(b)(3), defines "recklessly" as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

19

## IV. CONCLUSION

Accordingly, we reverse DHS' order which sustained the Mother's appeal and direct DHS to maintain the indicated report of child abuse on the ChildLine Registry.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lancaster County Children and     :     **SEALED CASE**
Youth Social Services Agency,     :
            Petitioner     :
    :
         v.     :     No. 1255 C.D. 2019
    :
Department of Human Services,     :
           Respondent     :

## O R D E R

AND NOW, this 1st day of July, 2020, the order of the Department of Human Services, Bureau of Hearings and Appeals, is hereby REVERSED.

 

                                    _____
                                    P. KEVIN BROBSON, Judge